908 F.2d 966
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Edgwina ADAMS, Mary E. Adams, Administratrix of the Estate
of Charlie Adams, Plaintiffs-Appellees,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant-Appellant,
and
United States Fidelity and Guaranty Company, Defendant.
 No. 89-2408.
 United States Court of Appeals, Fourth Circuit.
 Argued February 6, 1990
Decided July 12, 1990.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert J. Staker, District Judge. (CA-86-703-3).
 Richard Gregory McNeer, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, W.Va., (argued), for appellant; David Reid Dillon, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, W.Va., on brief.
 Richard Thompson, Wayne, West Virginia, for appellee.
 S.D.W.Va.
 AFFIRMED.
 Before MURNAGHAN and WILKINSON, Circuit Judges, and Hiram H. WARD, Senior United States District Judge for the Middle District of North Carolina, Sitting by Designation.
 PER CURIAM:
 
 
 1
 While test driving an automobile owned by Car Spot, Inc. ("Car Spot"), Edgwina and Charlie Adams were struck by an automobile driven by Charlotte Hall. Charlie Adams died and Edgwina Adams was injured. Two passengers in the car driven by Hall also were injured. There is no dispute that the accident was caused by Hall's negligence.
 
 
 2
 The various parties were insured as follows. The Adamses were covered by a policy with State Farm Mutual Automobile Insurance Company ("State Farm"). The policy provided underinsured motorist coverage with limits of $50,000 per individual and $100,000 per occurrence.[1] Hall was covered by a policy with Capital Enterprise Insurance Group ("Capital"). Car Spot was covered by a policy with United States Fidelity and Guarantee Company ("USF & G"). The USF & G policy provided $1,000,000 in liability coverage but contained no explicit provision for underinsurance coverage.
 
 
 3
 Edgwina Adams and the estate of Charlie Adams ("plaintiffs") brought two lawsuits. In the United States District Court for the Eastern District of Kentucky, they sued Hall for negligence. The court ruled for the plaintiffs, awarding $150,000 to the estate of Charlie Adams and $110,000 to Edgwina Adams. The plaintiffs settled with Capital, receiving $40,000 for the estate of Charlie Adams and $25,000 for Edgwina Adams.
 
 
 4
 The plaintiffs also brought a declaratory action against USF & G and State Farm in West Virginia state court seeking a declaration of their underinsurance coverage rights against the two insurers. The defendants removed the case to federal court. In the suit, the plaintiffs acknowledged that Car Spot's policy with USF & G did not provide for underinsurance. However, the plaintiffs argued, USF & G had failed to offer an adequate opportunity to obtain underinsurance coverage to Car Spot and that alleged failure violated West Virginia Code Sec. 33-6-31(b),[2] under which underinsurance coverage in the amount of the liability coverage would be implied by law. In the alternative, the plaintiffs argued they were entitled to recover under the underinsurance coverage explicitly provided in their policy with State Farm.
 
 
 5
 While the suit was pending, the West Virginia Supreme Court of Appeals heard an appeal of an unrelated case, the decision of which would govern the analysis of whether underinsurance should be implied by law in the USF & G policy. Accordingly, the district court below stayed the suit, pending a decision from the West Virginia high court.
 
 
 6
 Before the West Virginia Supreme Court of Appeals issued a decision, however, the plaintiffs settled with USF & G. USF & G, without objection by State Farm, was subsequently dismissed from the suit. Under the terms of the settlement, USF & G was to pay $45,000 to the estate of Charlie Adams and $22,500 to Edgwina Adams. Thus, as a result of their settlements with Capital and USF & G, the estate of Charlie Adams had received $85,000 (as compared to the damages of $150,000 found by the Kentucky federal court) and Edgwina Adams had received $47,500 (as compared to the damages of $110,000 found by the Kentucky federal court).
 
 
 7
 After the dismissal of USF & G, the West Virginia Supreme Court of Appeals handed down its decision in the pending case of Bias v. Nationwide Mutual Ins. Co., 365 S.E.2d 789 (W.Va.1987). The decision involved an interpretation of Sec. 33-6-31(b)'s requirement that every policy "shall provide an option to the insured" of obtaining underinsurance coverage. The court wrote:
 
 
 8
 [T]he insurer has the burden of proving that an effective offer was made, and that any rejection of said offer by the insured was knowing and informed. The insurer's offer must be made in a commercially reasonable manner, so as to provide the insured with adequate information to make an intelligent decision. The offer must state, in definite, intelligible, and specific terms, the nature of the coverage offered, the coverage limits, and the costs involved. When an insurer is required by statute to offer optional coverage, it is included in the policy by operation of law when the insurer fails to prove an effective offer and a knowing and intelligent rejection by the insured.
 
 
 9
 Id. at 791 (citations omitted).
 
 
 10
 State Farm thereupon moved for summary judgment, arguing that USF & G did not make an adequate offer of underinsurance to Car Spot under the standard enunciated in Bias, and, therefore, Car Spot, by operation of law, carried underinsurance coverage in the amount of $1,000,000 with USF & G; that by operation of law the plaintiffs were beneficiaries of Car Spot's underinsurance coverage; that USF & G's coverage was primary to State Farm's coverage; that the coverage provided by USF & G would be in the face amount of the implied coverage ($1,000,000), hence clearly sufficient as primary coverage; and that, accordingly, the plaintiffs' recovery rights lay with USF & G, not with State Farm.
 
 
 11
 The district court denied State Farm's motion for summary judgment. The court agreed that if Car Spot had underinsured motorist coverage with USF & G by operation of law, the coverage would be primary to State Farm's and that the coverage would be in the amount of $1,000,000. However, the court felt there was a genuine issue of material fact as to whether communications between the USF & G agent and Car Spot's president, examined infra, had amounted to an adequate offer of underinsurance under the Bias standard. If USF & G had made an adequate offer and Car Spot had rejected that offer, then, under Bias, Car Spot would not have had underinsurance coverage with USF & G and the plaintiffs' recovery would lie with State Farm. Therefore, trial was deemed necessary to determine if such an offer and rejection had occurred.
 
 
 12
 At trial, both sides presented evidence pertaining to the manner in which USF & G had offered underinsurance coverage to Car Spot and Car Spot's arguable rejection of that coverage. The principal evidence on the issue was the testimony of USF & G agent Charles Carroll and Car Spot president Charles Runyon. Carroll provided uncontradicted, though uncorroborated, testimony that he made an in-person offer of underinsurance coverage to Runyon. Carroll described his explanation to Runyon of the costs involved as follows:
 
 
 13
 Q Did you tell [Runyon] what the cost would be for such coverage?
 
 
 14
 A No, no, because he wasn't interested. He didn't ask and he wasn't interested. You can't--generally when you deliver a policy, you go over these coverages, you explain what they have, what they don't have. If you strike a subject that they are particularly interested in, they will generally say, 'Charlie, why don't you get me a price on that and we'll think about it.' It would be extremely time consuming to get prices on every renewal on every form of coverage before you delivered it.
 
 
 15
 Q Well, let me ask you this: As opposed to telling him what the specific cost was, did you tell him that underinsured coverage would cost a relatively small amount?
 
 
 16
 A I was--yes, yes.
 
 
 17
 Q Did Mr. Runyon indicate whether he wanted that coverage, underinsured motorists coverage, that is?
 
 
 18
 A He indicated that he did not want it.
 
 Runyon testified as follows:
 
 19
 Q For the times [Carroll] came out prior to the Adams' accident, you don't recall specifically what was said and done; is that correct?
 
 
 20
 A Correct.
 
 
 21
 Q I take it then you cannot say one way or the other whether he offered underinsured motorist coverage to you before the Adams' accident; is that correct?
 
 
 22
 A I don't remember the expression 'underinsured,' but I don't know. You know, you are talking about something that happened so long ago that if he did I couldn't remember, if he didn't I couldn't remember.
 
 
 23
 In addition to Carroll's face-to-face communications with Runyon, there was further evidence of attempts by USF & G to alert Car Spot to the availability of underinsurance. USF & G had provided Car Spot with a document entitled "IMPORTANT MESSAGE FOR OUR WEST VIRGINIA INSUREDS." That document included the following:
 
 
 24
 WHAT IS UNDERINSURED MOTORIST COVERAGE?
 
 
 25
 Underinsured Motorist Coverage enables you to recover damages to which you are legally entitled for bodily injury or property damage which exceed[s] the limit of Liability Coverage carried by the owner or operator of the other vehicle.
 
 
 26
 .............................................................
 
 
 27
 ...................
 
 
 28
 * * *
 
 
 29
 DO YOU HAVE ANY OPTIONS?
 
 
 30
 ... [Y]ou may select increased limits of Uninsured Motorists Coverage and/or Underinsured Motorists Coverage up to the Liability Coverage limits of your policy.
 
 
 31
 You should give careful consideration to this additional insurance coverage because it may provide important protection for a small premium.
 
 
 32
 There was evidence that USF & G enclosed with the message a form on which the insured could select one of several available underinsurance plans.
 
 
 33
 The district court found as fact that Runyon received the message and the attached form. The district court further found that:
 
 
 34
 Carroll offered underinsured motorist coverage to Runyon (Car Spot) and in so doing informed, and explained to, Runyon the availability of that coverage to Car Spot under that renewal policy, the nature of that coverage, what that coverage was and under what circumstances it would and would not apply, and that the cost to Car Spot therefor would be 'relatively small,' and that, acting on Car Spot's behalf, Runyon then declined to purchase that coverage from USF & G for Car Spot.
 
 
 35
 Based on those factual conclusions, the district court found that Carroll "effectively" offered underinsurance to Car Spot and that he did so "in a commercially reasonable manner, so as to provide Runyon, acting as he was for Car Spot, with adequate information for Runyon to make an intelligent decision as to whether or not Car Spot should purchase that coverage from USF & G, and that in so doing Carroll stated, in definite, intelligible, and specific terms" the relevant features of the available coverage. The district court acknowledged that Carroll did not quote Runyon a specific price. However, the district court reasoned that where Carroll's efforts to alert Runyon to the availability of underinsurance were so zealous, it simply would not make sense to require a specific price quote, especially given that Runyon had already rejected the offer of insurance in a manner that the district court found to be "knowing and intelligent."
 
 
 36
 We find no error in the district court's analysis. The determination of whether a given set of face-to-face communications constitutes an effective offer is necessarily fact-bound. Here, the district court found, in a manner not clearly erroneous, facts that track the standard announced in Bias. The court found an effective offer made in a commercially reasonable manner and a knowing and informed rejection by the insured. We are somewhat concerned as to whether Carroll's failure to quote a specific price comports with Bias' requirement for a statement in "specific terms" of the "costs involved." However, where, as here, the district court is so convinced as a factual matter that further specification of cost would have served no purpose, the court's subsequent finding of compliance with Bias will not be disturbed. See League General Ins. Co. v. Tvedt, 317 N.W.2d 40 (Minn.1982) (insurer's failure to specify cost excused where insurer otherwise made aggressive attempt to encourage purchase of the additional insurance). As to the effect under Bias of a failure to specify a cost in the absence of certainty that the insured would have refused the offer anyway we express no opinion.[3]
 
 
 37
 Accordingly, the judgment of the district court against State Farm and in favor of the plaintiffs is
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 Underinsured motorist coverage, or underinsurance, entitles an insured to collect, up to the underinsurance policy limits, the amount by which the insured's damages exceed the limits of a wrongdoer's liability policy
 
 
 [2]
 Section 33-6-31 provides that automobile insurance policies
 shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which he shall legally be entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle up to an amount not less than limits of bodily injury liability insurance and property damage liability insurance purchased by the insured without setoff against the insured's policy or any other policy.
 
 
 [3]
 We note that, in the context of the instant case, the question was of primary interest to State Farm and USF & G. The plaintiffs were only collaterally concerned on a one-time, secondary basis. It was, therefore, incumbent, if State Farm truly expected to rely on the contention of USF & G underinsured motorist coverage, on State Farm to seek resolution of the issue before allowing USF & G's dismissal from the case. Although State Farm did raise the issue in opposition to a motion for summary judgment brought by USF & G, State Farm did not object to the settlement that resulted in USF & G's dismissal
 State Farm has made the additional contention that even if it is liable to the plaintiffs, the liability should be reduced by a set-off against the policy limits of the amounts received by the plaintiffs from their settlement with Hall's insurer. However, prior to judgment, State Farm stipulated that if it was liable, each of the plaintiffs would be entitled to the policy limits plus pre-judgment interest. We hold State Farm to its stipulation and, accordingly, reject its argument as to set-off.